753 A.2d 1265

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Sheldon HANNIBAL, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 20, 1997.

Decided June 20, 2000.

Reargument Denied Sept. 1, 2000.

134

David M. McGlaughlin, Philadelphia, for S. Hannibal.

Catherine Marshall, Mary L. Porto, Philadelphia, for Com.

Robert A. Graci, Harrisburg, for Attorney General's Office.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## *OPINION ANNOUNCING THE JUDGMENT OF THE COURT*

FLAHERTY, Chief Justice.

This is an automatic direct appeal from the judgment of sentence of death imposed on appellant, Sheldon Hannibal, for first degree murder by the Court of Common Pleas of Philadelphia County.[1,2]

Appellant was charged in connection with the killing of Peter LaCourt. Following a jury trial, appellant was found guilty of criminal homicide (first degree murder);[3] criminal conspiracy;[4] and possessing instruments of crime.[5] Appellant was tried jointly with his co-defendant, Larry Gregory.[6]

At trial, the evidence established that in the early morning hours of October 25, 1992, Peter. LaCourt and his friend, Barbara Halley, encountered appellant and Tanesha Robinson, who were sitting in a stairway at the Cambridge Mall housing project. LaCourt tried to sell appellant a gold chain. After looking at the chain, appellant started an argument with LaCourt concerning whether the chain was genuine. Appellant refused to return the chain to LaCourt, pulled out a gun, and began to beat LaCourt with it. Appellant then knocked on the door of Larry Gregory, who joined in the beating, using

---

1. *See,* 42 Pa.C.S. §§ 722(4), 9711(h)(1); Pa.R.A.P. Rule 702(b) and Rule 1941.

2. The jury also convicted appellant of criminal conspiracy and possession of instruments of crime. In addition to the sentence of death for first degree murder, appellant was sentenced to consecutive terms of eleven and one-half (11 1/2) to sixty (60) months on the possession charge and sixty-six (66) to one-hundred-thirty-two (132) months for criminal conspiracy.

3. 18 Pa.C.S. § 2502(a).

4. 18 Pa.C.S. § 903.

5. 18 Pa.C.S. § 907(a).

6. Gregory was also convicted of first degree murder; he was sentenced to life imprisonment. The Superior Court, in a memorandum decision issued April 3, 1997, affirmed Gregory's judgment of sentence.

his own gun to pistolwhip LaCourt. As LaCourt pled for the beating to stop, Ms. Robinson ran up the stairway. Seconds after she left the scene of the beating, she heard approximately ten gunshots. Barbara Halley, meanwhile, had gone to the guard's station in the lobby to seek help and, thus, was not present when the shots were fired.

A Philadelphia Housing Authority police officer found LaCourt lying on the stairway and observed gunshot wounds to his head and back. Police found eleven 9 mm shell casings at the crime scene. Portions of the gold chain were also recovered from the stairway.

An autopsy revealed that LaCourt had suffered blunt force trauma injuries to the right front and top of his head, as well as injuries from falling. Six bullets struck LaCourt's body; two hit him from the front, resulting in a perforated gunshot wound of the lower left arm and a grazing gunshot wound to his fingers which were characterized as defensive wounds. The remaining four bullets struck LaCourt as he lay on the floor. The cause of death was ruled to be severance of LaCourt's brain stem by one of the bullets which struck him.

Ms. Robinson subsequently gave statements to police concerning the murder and testified on behalf of the Commonwealth at the preliminary hearings regarding appellant and Gregory. Following that testimony, she and two of her female friends were killed in Ms. Robinson's apartment in the presence of a six-month-old baby.

Appellant testified at trial that he did not know where he was on the night LaCourt was killed. Appellant further testified that he did not have an altercation with LaCourt; that he did not take LaCourt's chain; that he did not have a gun; and that he did not shoot LaCourt.

After the penalty phase hearing, the jury returned a sentence of death on appellant's first degree murder conviction. The jury concluded that there was one aggravating circumstance [7] and no mitigating circumstances.[8]

7. 42 Pa.C.S. § 9711(d)(6) (appellant committed the killing while in the perpetration of a felony).

Pursuant to *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982), we are required to review all death penalty cases for the sufficiency of evidence to sustain the conviction for murder of the first degree.

In *Commonwealth v. Koehler,* 558 Pa. 334, 737 A.2d 225, 233–34 (1999) we held:

> To sustain a conviction for first degree murder, the Commonwealth must prove that the defendant acted with a specific intent to kill, that a human being was unlawfully killed, that the accused did the killing, and that the killing was done with deliberation. It is the specific intent to kill which distinguishes murder in the first degree from lesser grades of murder. We have held that the use of a deadly weapon on a vital part of a human body is sufficient to establish the specific intent to kill. Finally, the Commonwealth can prove the specific intent to kill through circumstantial evidence.

█ The evidence presented at trial was that appellant and Greggory beat and shot LaCourt and robbed him of a gold chain. Two female witnesses fled the beating. Robinson heard shots seconds after she left the scene of the beating, where appellant and Greggory were pistol whipping LaCourt. Robinson ran to her cousin's apartment on the sixth floor, where she looked from a window and saw appellant and Greggory fleeing in a gray car moments after the shooting. Two other witnesses testified concerning a plot to murder Robinson in order to prevent her from testifying at trial. Terrance Richardson testified that he was present when he heard Greggory and his brother give two other men a .357 revolver and $2,000 in cash and the directions to "be fast about it" and to "leave no witnesses." The next day fifteen year old Robinson and two of Robinson's friends were shot to death in Robinson's apartment. James Buigi, a cellmate of appellant, testified that appellant told him that he had ordered a "couple

8. Appellant had presented evidence of mitigation under 42 Pa.C.S. § 9711(e)(4), the age of the defendant at the time of the crime, and § 9711(e)(8), any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.

of his boys" to kill Robinson.[9] Appellant also admitted to Buigi that he killed LaCourt and indicated that the only way he could escape conviction was to kill Robinson. This evidence is sufficient to prove that appellant intentionally and unlawfully killed LaCourt.

Appellant contends that the trial court's instruction to the jury violated this court's holding in *Commonwealth v. Huffman*, 536 Pa. 196, 638 A.2d 961 (1994). Specifically, appellant submits that the trial court erroneously instructed the jury regarding the element of specific intent by stating that a defendant could be found guilty of first degree murder where either he, his accomplice *or* co-conspirator possessed the requisite specific intent.

 The standard by which this court reviews a challenge to a jury instruction is as follows:

When evaluating jury instructions the charge must be read as a whole to determine whether it was fair or prejudicial. The trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration.

\* \* \* \*

We will not rigidly inspect a jury charge, finding reversible error for every technical inaccuracy, but rather evaluate

9. Buigi testified that after having smoked a "few marijuana sticks" he and appellant began discussing why they were both in jail. It was Buigi's testimony that it was during this conversation that appellant admitted to having shot the victim. According to Buigi, appellant asked him whether he knew much about the law and more specifically, whether appellant could be found guilty of first degree murder if the key witness against him was not there to testify against him. According to Buigi, appellant then told him about the incident with the gold chain, the pistol-whipping and the fact that girl who had been sitting with appellant on the stairwell saw the pistol-whipping, but did not see him actually shoot the victim. Buigi testified that appellant also told him that he had arranged to have this particular girl murdered so as to prevent her testimony at his trial. Buigi testified that he told the police the very next day about his conversation with appellant. He testified that his decision to go to the police was a result of his having known the victim and his family.

whether the charge sufficiently and accurately apprises a lay jury of the law it must consider in rendering its decision. *Commonwealth v. Prosdocimo,* 525 Pa. 147, 578 A.2d 1273, 1274, 1276 (1990).

In *Huffman,* we addressed the propriety of the trial court's instruction on the issue of accomplice liability in a first degree murder case. That instruction provided as follows:

[I]n order to find a Defendant guilty of murder in the first degree, you must find that the Defendant caused the death of another person, or that an accomplice or cc-conspirator caused the death of another person. That is, you must find that the Defendant's act or the act of an accomplice or co-conspirator is the legal cause of death of [the victim], and thereafter you must determine if the killing was intentional.

*Huffman,* 638 A.2d at 962.

■ This court found the charge in *Huffman* to be patently erroneous because it allowed the jury to reach a first degree murder verdict without a finding that the accomplice/appellant himself possessed the requisite specific intent to kill. We stated:

[t]o determine the kind of homicide of which the accomplice is guilty, it is necessary to look to *his* state of mind; the requisite mental state must be proved beyond a reasonable doubt to be one *which the accomplice harbored and cannot depend upon proof of the intent to kill only in the principal.*

*Huffman,* 638 A.2d at 962 (emphasis in original) (quoting *Commonwealth v. Bachert,* 499 Pa. 398, 453 A.2d 931, 935 (1982)). We recently reaffirmed the this critical rule of law in *Commonwealth v. Wayne,* 553 Pa. 614, 720 A.2d 456 (1998), *cert. denied* —— U.S. ——, 120 S.Ct. 94, 145 L.Ed.2d 80 (1999) noting specifically that first degree murder is distinguished from all other degrees of murder by the existence of a specific premeditated intent to kill that is harbored by the accused. Before a conviction for first degree murder can be sustained, it must be shown that the accused possessed a fully formed intent to take a life. *Id.*

With this standard in mind, we now turn to the charge given in the instant matter. In relevant part, the trial court first charged the jury as follows:

You may find a defendant guilty of a crime without finding that he personally engaged in conduct required for committing that crime. A defendant is guilty of a crime if he is an accomplice of another person who commits that crime. A defendant does not become an accomplice merely by being present at the scene or knowing about the crime. He is an accomplice if with the intent of promotion [sic] or facilitating a commission of the crime he encourages, requests, solicits or commands the other person to commit it or he aids, agrees to aid or attempts to aid the other person in planning or committing it.

In considering accomplice, the least degree of concert or collusion is sufficient to sustain a finding of responsibility as an accomplice.

(N.T. 3/9/94 (Vol.11) at 132–133). The court then instructed on first degree murder stating the following:

First degree murder is murder in which the killer has the specific intent to kill. You may find a defendant guilty of first degree murder if you are satisfied of the following three elements:

That he, his accomplice or co-conspirator killed the deceased.

Two, that LaCourt is dead.

And three, that the defendant, his accomplice or co-conspirator did so with the specific intent to kill and with malice.

(N.T. 3/9/94 (Vol.11) at 135–36). Immediately thereafter, the trial court provided the following definition of specific intent:

A person has the specific intent to kill if he has a fully formed intent to kill and is conscious of his own intention. As a definition of malice indicates, a killing by a person who has the specific intent to kill is a killing with malice provided that it is also without certain circumstances. Stated differently, a killing is a specific intent to kill if it is willful and deliberate. The specific intent to kill, including premedita-

tion needed for first degree murder does not require planning or previous thought or any particular length of time. In can occur quickly. All that is necessary is that there be time enough so that a defendant can and does fully form an intent to kill and is conscious of that intention. When deciding whether a defendant had the specific intent to kill, you should consider all of the evidence regarding his or his accomplice or co-conspirators words and conduct and the attending circumstances that may show his state of mind at that time.

If you believe that a defendant intentionally used a deadly weapon on a vital part of the victim's body, you may regard that as an item of circumstantial evidence from which you may, if you choose, infer that the defendant, his accomplice or co-conspirator had the specific intent to kill.

(N.T. 3/9/94 (Vol. II) at 136–137).

Appellant's claim, in essence is that the trial court informed the jury that it could find "a defendant" guilty of first degree murder if either defendant possessed the requisite specific intent to kill. The operative words with which the appellant is concerned are:

... the defendant, his accomplice or co-conspirator did so with the specific intent to kill and with malice.

Appellant interprets these words to mean that the accomplice may be convicted if either the accomplice or the principal had specific intent to kill. This misreads the instruction. When a series of nouns is separated by a comma and the last two elements of a series are the same entity (accomplice or co-conspirator), the sentence is properly understood to consist of a series of two nouns, not three. Thus, the sentence may be read to say, "the jury may find the accomplice guilty if it finds that the defendant *and* his accomplice (or you may think of him as a co-conspirator) acted with specific intent to kill and malice."

Further, when the court clarified the various degrees of murder, it stated:

First, in order to clarify, I remind you that you are to consider the evidence and the law separately as to each individual in this case. Although this trial is based on a single incident, each defendant is on trial before you individually and is to be found guilty or not guilty based on the evidence or lack of evidence as to him alone.

The instruction was not in error and the court consistently and in understandable language referred to the need to consider whether each individual in the case possessed the requisite specific intent to kill.

Having concluded that Hannibal's conviction was proper, we are required to perform an automatic review of the sentence of death pursuant to 42 Pa.C.S. § 9711(h)(3), as follows: we are required to affirm the sentence of death unless we determine that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

The jury found one aggravating circumstance in the case, that the killing was committed while in the perpetration of a felony, and no mitigating circumstances. Our review of the record establishes beyond any reasonable doubt that the killing was carried out during a robbery, and therefore that the murder was committed during the commission of a felony; that the sentence was not the product of passion, prejudice or any arbitrary factor; and that the sentence was not disproportionate to the penalty imposed in similar cases.[10]

10. Although the General Assembly removed proportionality review from the death penalty statute effective June 25, 1997, proportionality review remains a requirement for all death penalty convictions before that date. Since Hannibal's sentence was imposed before June 25,

 The judgment of sentence of death is affirmed.[11,12]

1994, we are required to conduct a proportionality review. See *Commonwealth v. Gribble*, 550 Pa. 62, 703 A.2d 426, 440 (1997).

11. Hannibal raises a number of additional claims, all of which we have carefully examined, but none of which merit extended discussion. First, Hannibal claims that trial counsel was unprepared for trial and, therefore, that he was ineffective in several respects. He claims that counsel was ineffective in failing to call two alibi witnesses; that counsel met with him only once; that counsel failed to obtain psychiatric assistance at the penalty phase of the trial; that counsel was ineffective for failing to subpoena certain documents (records of where Hannibal was imprisoned); and that counsel failed to file an appellate brief until after it was due.

These claims are without merit for a number of reasons. First, Hannibal does not set out the ineffectiveness analysis required by Pennsylvania law. See, *Commonwealth v. Balodis*, 560 Pa. 567, 747 A.2d 341, 2000 Pa. LEXIS 419 (2000). Pursuant to this analysis, an appellant must prove (1) the issue which counsel did not address had arguable merit; (2) counsel's course of action had no reasonable basis; (3) counsel's action prejudicially affected the outcome of the case. Further, Hannibal testified that he did not remember where he was on the night of the murder, which moots the importance of his claimed alibi witnesses. Next, even if counsel met him only once, that in itself does not mean that counsel was unprepared. Next, Hannibal does not state what a psychiatric witness would have stated if one had been called. Next, the failure to subpoena prison records as to Hannibal's location in prison—which would have been offered to show that Hannibal was not in a cell with Buigi and could not, therefore, have confessed to Buigi—fails because he fails to show that such records exist. Finally, the fact that counsel filed a brief after it was due, if true, does not tend to prove ineffectiveness because counsel explained that Hannibal stated to the court that he wanted a new attorney.

Next, Hannibal claims that his trial was unfair because evidence of the murder of Tanesha Robinson, a witness, was admitted into evidence and that trial counsel was ineffective in failing to object to the introduction of evidence that Hannibal was linked to the murder of Tanesha Robinson.

This claim too fails for a number of reasons. First, the trial court did not err in admitting this evidence since it is part of the history of the case. Second, the claim of ineffectiveness fails because Hannibal again fails to set out the three pronged test for ineffectiveness of counsel. Third, there was no basis to object to the evidence because it was admissible to show Hannibal's consciousness of guilt. *Commonwealth v. Goldblum*, 498 Pa. 455, 447 A.2d 234 (1982)(evidence that appellant agreed to pay undercover operative to kill witness is admissible to show consciousness of guilt). Therefore, the trial court did not err in admitting this evidence, and defense counsel was not ineffective for failing to object to the admission of this evidence.

Next, Hannibal claims that the trial court erred in permitting the preliminary hearing testimony of Tanesha Robinson and her statements to police to be introduced into evidence. Robinson had testified at the

preliminary hearings of Hannibal on April 13, 1993 and of Greggory on May 4, 1993. According to Hannibal's statement to his cellmate, Robinson was murdered on his orders, in order to silence her testimony.

Hannibal's first claim is that the admission of this testimony is violative of the confrontation clause. This claim is without merit because there is statutory authority to admit the evidence in question:

> Whenever any person has been examined as a witness, either for the Commonwealth or for the defense, in any criminal proceeding conducted in or before a court of record, and the defendant has been present and has had an opportunity to examine or cross examine, if such witness ... is out of the jurisdiction so that he cannot be effectively served with a subpoena, or if he cannot be found ... notes of his examination shall be competent evidence upon a subsequent trial on the same criminal issue.

42 Pa.C.S. § 5917.

Hannibal objects, however, that the testimony about which he is complaining was from the May 4, 1993 hearing, to which Hannibal was not a party, for it was the preliminary hearing for Greggory. Since he was not a party, he was not able to cross examine, and in any event, it was error to admit the May 4 testimony against Hannibal, for the evidence at preliminary hearing concerned Greggory.

This argument fails because Hannibal himself admits that Robinson's April 13, 1993 testimony was substantially the same as Robinson's May 4 testimony, and both were admitted into evidence. Any error in admitting the May 4 transcript into evidence was, therefore, harmless error, for the content of both preliminary hearing statements was substantially the same as to Hannibal and both statements were before the jury. Similarly, Robinson's police statements, which were given two days after LaCourt's murder and were given at great risk to the witness, were virtually identical to the preliminary hearing statements. Thus, the police statements were made under circumstances which guaranteed their trustworthiness and, in any event, the police statements were merely cumulative. There was no error in admitting either the preliminary hearing transcripts or the statements to police.

Finally, Hannibal claims that it was error for the trial court to enter an order prohibiting the disclosure of the identity of the witnesses Buigi and Richardson and prohibiting the disclosure of the contents of their expected testimony. The court entered this order because Hannibal was already suspected of killing a witness.

Buigi testified on the first day of trial and the trial court told Hannibal that he could have a reasonable time to prepare for cross-examination. Richardson testified on the third day of trial and the court allowed Hannibal to question Richardson out of the presence of the jury as to an alleged disability which might have had a bearing on his ability to see, hear and report accurately what he had seen. Under questioning, Richardson indicated that he received social security for a tendency to express anger inappropriately, and the court ruled that this disability was unrelated to his ability to see, hear and to report what he had seen and heard. The court also gave defense counsel reasonable time to prepare for additional cross-examination. In fact, defense counsel vigorously questioned both witnesses about their motives for

146

Justice CASTILLE joins the Opinion Announcing the Judgment of the Court and files a concurring opinion.

Justice NIGRO concurs in the result and files a concurring opinion.

Justice CAPPY files a dissenting opinion in which Justice ZAPPALA joins.

CASTILLE, Justice, concurring.

I join the majority opinion, but write separately to address the following points.

I agree with the majority that the jury charge here, considered as a whole, conformed to the rule announced in *Commonwealth v. Huffman*, 536 Pa. 196, 638 A.2d 961 (1994), governing instructions on accomplice liability in first degree murder cases. The disapproved charge quoted in *Huffman* contained no elaboration on the basis for finding accomplice liability. *Id.* at 198–99, 638 A.2d at 962. Here, in contrast, as the majority has correctly noted, the trial court separately and thoroughly charged the jury on accomplice liability—indeed, it did so in an instruction that mirrors the language in the Crimes Code defining accomplice liability. *See* 18 Pa.C.S. § 306(c). I would also add that the *Huffman* issue here is not even applicable for several reasons: first, the evidence, including appellant's confession to a cellmate, amply proved appellant's guilt as the principal (*i.e.*, the actual shooter), not as an accomplice, *see Commonwealth v. Wayne*, 553 Pa. 614, 633,

testifying and questioned both at great length. Buigi's cross-examination was nearly 30 pages and Richardson's was 40 pages long.

Thus, the protective order was properly entered to protect the lives of the witnesses; defense counsel was given time to prepare for cross-examination; defense counsel conducted a vigorous cross-examination; and in any event, Hannibal does not specify how he was prejudiced by the protective order. Even if the trial court improperly failed to grant adequate time to prepare for cross examination—which it did not—unless we are told what Hannibal would have discovered had he had more time to prepare for cross-examination of these witnesses, his claim fails.

12. We direct the Prothonotary of the Supreme Court of Pennsylvania to transmit the complete record of this case to the Governor of Pennsylvania. 42 Pa.C.S. § 9711(i).

720 A.2d 456, 465 (1998), *cert. denied, Wayne v. Pennsylvania,* — U.S. ——, 120 S.Ct. 94, 145 L.Ed.2d 80 (1999); second, the circumstantial evidence alone proved the shared criminal intent of appellant and his co-defendant Gregory, who jointly pistol-whipped the victim before appellant shot him; and third, appellant was convicted of conspiracy.

The last point is worthy of elaboration. Criminal conduct involving multiple perpetrators often, but not always, involves multiple theories of vicarious liability, *i.e.,* conspiracy liability (which requires an agreement) and accomplice liability (which does not). The theories serve different purposes and have different contours. *Commonwealth v. Bachert,* 499 Pa. 398, 453 A.2d 931 (1982), *cert. denied, Bachert v. Pennsylvania,* 460 U.S. 1043, 103 S.Ct. 1440, 75 L.Ed.2d 797 (1983), was a sufficiency of the evidence case which discussed only the level of proof necessary to prove guilt of first degree murder on a theory of accomplice liability. *Bachert's* holding that the accomplice himself, and not merely a confederate, must possess the necessary mental state was thoroughly consistent with the Crimes Code's definition of accomplice liability. *See* 18 Pa.C.S. § 306(c)(1) (person is an accomplice if, *with the intent of promoting or facilitating the commission of the offense,* he solicits another to commit it, or aids, agrees, or attempts to aid another in committing the offense) (emphasis added). *Huffman* was a non-sufficiency case involving a challenge to the propriety of the court's accomplice liability charge. Relying upon *Bachert,* the Court disapproved a charge that permitted the jury to convict the accomplice of first degree murder "with no finding of the requisite mental state of 'specific intent to kill'" on the part of the accomplice. 536 Pa. at 199, 638 A.2d at 963.

Two years ago, in *Commonwealth v. Wayne, supra,* this Court extended the *Bachert/Huffman* teachings on *accomplice* liability to first degree murder cases involving *conspiracy* liability. Although I joined in the *Wayne* opinion, upon further careful consideration of this recurring point, I am convinced that the *Wayne* reconfiguration was an erroneous

intrusion into the legislature's power to define the substantive criminal law.[1]

In *Wayne,* this Court accurately described the general rule of conspiracy liability as follows:

> The general rule of law pertaining to the culpability of conspirators is that each individual member of the conspiracy is criminally responsible for the acts of his co-conspirators committed in furtherance of the conspiracy. The co-conspirator rule assigns legal culpability equally to all members of the conspiracy. All co-conspirators are responsible for actions undertaken in furtherance of the conspiracy regardless of their individual knowledge of such actions and regardless of which member of the conspiracy undertook the action. The premise of the rule is that the conspirators have formed together for an unlawful purpose, and thus, they share the intent to commit any acts undertaken in order to achieve that purpose, regardless of whether they actually intended any distinct act undertaken in furtherance of the object of the conspiracy. It is the existence of shared criminal intent that 'is the *sine qua non* of a conspiracy.'

*Wayne,* 553 Pa. at 630, 720 A.2d at 463–64 (citations omitted).

However, the *Wayne* Court fashioned an exception to this general rule, based upon the perception that first degree murder should be treated differently from other offenses because of the severity of the punishment. Importing the accomplice liability principles that animated *Bachert* and *Huffman,* it reconfigured *conspiracy* law, essentially holding that the crime of first degree murder would no longer be susceptible to traditional conspiracy analysis. Under the *Wayne* reconfiguration, a defendant cannot be convicted of first degree murder under a theory of conspiracy liability, even if the killing was in furtherance of the conspiracy, unless the Commonwealth separately proves that the defendant harbored a specific intent to kill. *Id.* at 630–31, 720 A.2d at 464. I

---

1. *Wayne*'s discussion in this regard arguably was *dicta,* since the appellant there was denied relief based on a finding that any error in the conspiracy liability charge was harmless beyond a reasonable doubt.

disagree with the *Wayne* reconfiguration and would return to the pre-*Wayne* law as it has existed in this Commonwealth. The Crimes Code certainly does not require the *Wayne* exception to conspiracy liability. Generally, there is no requirement that conspirators must specifically contemplate each particular crime that may occur in furtherance of the conspiracy before liability may attach. I certainly see no principled basis for this Court's revision of the law of conspiracy simply because the charge involved is first degree murder.

There is a synergy that arises from criminal confederations. People who might not have the individual courage, the ability, or the ill judgment to commit a crime on their own become emboldened when they join with confederates to plan and launch a criminal enterprise. In recognition of the distinct dangerousness of this criminal phenomenon, the legislature has codified conspiracy itself as a separate crime—*i.e.*, conspiracy is not just a theory of liability, it is a distinct crime. There is no logical reason to single out first degree murder from other crimes in determining the reach of conspiracy liability.

I would return to the terms of the Crimes Code and the settled pre-*Wayne* law recognizing the long-standing principle that, in a conspiracy, " 'the least degree of concert or collusion between parties to an illegal transaction makes the act of one the act of all.' " *Commonwealth v. Strantz*, 328 Pa. 33, 40, 195 A. 75, 79 (1937) (*citing* Chief Justice Gibson in *Rogers v. Hall*, 4 Watts 359, 361 (1835)). "No principle of law is more firmly established than that when two or more persons conspire or combine with one another to commit any unlawful act, each is criminally responsible for the acts of his associate or confederate committed in furtherance of the common design." *Strantz*, 328 Pa. at 40, 195 A. at 79. If one actor in a conspiracy acts on a specific intent to kill, and that act furthered the common design, then conspiracy liability should attach to all conspirators. The rule operates to dissuade persons from entering into criminal confederations that have, as a foreseeable consequence, the killing of another.

I see nothing harsh or unfair in this traditional rule. Conspiracy liability will attach only when the prospect of a killing was a foreseeable consequence of the criminal agreement. Furthermore, as a practical matter, the conspirators themselves are in the best position to know and describe the precise contours of the agreement or confederation. If they have a legitimate defense arising from the nature or scope of their confederation, they may forward it and have it assessed by the factfinder.

The traditional rule, moreover, is a practical necessity. The victim is never available in a murder case to testify who, among multiple actors, killed him. In homicides involving multiple actors, there is frequently no doubt at all that the killing was intentional and warrants a first degree conviction (as is indisputably the case here) but (again, as here) there is no independent eyewitness to testify which actor delivered the blow(s) that establish the degree of guilt.[2] It is in precisely such circumstances that traditional principles of vicarious liability are essential. As noted in the Dissenting Opinion in *Huffman*, without such theories,

> a jury will always be stuck with the broken record of how to attribute specific intent without identifying the particular roles of the perpetrators. So the killers will walk away from first degree murder and the death penalty. So the people will have been deprived of a fair trial.

*Huffman*, 536 Pa. at 204, 638 A.2d at 965 (Papadakos, J., dissenting). I would return to first principles and permit conspiracy liability to operate as it always had before, with respect to *all* crimes.

In summary, in cases involving theories of accomplice and conspiracy liability for first degree murder, I believe that the jury should be instructed on the elements of first degree murder, as well as what is necessary to prove liability as an

---

**2.** In first degree murder cases involving non-confessing defendants, it is often the nature of the killing that proves specific intent. Specific intent, of course, can be inferred from the use of a deadly weapon upon a vital part of the body. *E.g. Commonwealth v. Puksar*, 559 Pa. 358, 365, 740 A.2d 219, 223 (1999).

accomplice or conspirator. I would require nothing more than that those principles be adequately conveyed.

NIGRO, Justice, concurring.

I concur in the result reached by the majority. In my view, any error which may have occurred in the instructions regarding accomplice liability was harmless. The evidence in this case clearly established that Appellant was the actual shooter, and not the accomplice. Therefore, any irregularity in the trial court's accomplice instruction could not have affected Appellant's verdict and thus, must be viewed as harmless error. Accordingly, I agree with the majority that Appellant is not entitled to a new trial on this basis.

CAPPY, Justice, dissenting.

I respectfully dissent. Specifically, I find the majority's disposition of Appellant's issue raised pursuant to *Commonwealth v. Huffman*, 536 Pa. 196, 638 A.2d 961 (1994) and *Commonwealth v. Bachert*, 499 Pa. 398, 453 A.2d 931 (1982) to be disingenuous.

In *Huffman*, this court stated that in order for a defendant to be found guilty of first degree murder, the Commonwealth must establish that the defendant himself possessed the specific intent to kill, and that a defendant could not be convicted of first degree murder solely because his accomplice or co-conspirator who actually committed the homicidal act possessed the specific intent to kill. *Id.* at 962.

*Huffman* did not announce a new rule of law. This court's first clear recitation of this principle was delivered in *Commonwealth v. Bachert*, 499 Pa. 398, 453 A.2d 931 (1982). Justice (now Chief Justice) Flaherty delivered the opinion of the court, stating that the trial court must instruct the jury that

[t]o determine the kind of homicide of which the accomplice is guilty, it is necessary to look to his state of mind; the

requisite mental state must be proved beyond a reasonable doubt to be one which the accomplice harbored and cannot depend upon proof of the intent to kill only in the principal.

*Id.* at 935.

This requirement is not one which this court idly imposed on the trial courts. We have stated that such an instruction is mandatory because "[i]t is the unique harboring of malice with willful premeditation that causes first degree murder to be distinctly villainous. It is precisely because of the deliberate nature of first degree murder that this crime carries the most severe penalty the law can impose—death. To allow a conviction for first degree murder to stand without proof beyond a reasonable doubt establishing that the accused actually harbored the specific intent to kill, would be unconscionable." *Commonwealth v. Wayne*, 553 Pa. 614, 720 A.2d 456, 464 (1998).[1]

Appellant claims that the *Huffman* and *Bachert* rule was violated in this matter. Specifically, he points to the trial court's instruction to the jury that Appellant could be convicted of first degree murder if the Commonwealth had established that "the defendant, his accomplice or co-conspirator [shot the victim] with the specific intent to kill and with malice." N.T., 3/9/1994, 135–36. Appellant claims that such an instruction gave the jury permission to convict him of first

1. In his concurring opinion, Mr. Justice Castille retracts his decision to join the majority opinion in *Wayne*. Mr. Justice Castille now finds that the court in *Wayne* impermissibly intruded into the legislative domain by altering the traditional rule of co-conspirator liability as it relates to first degree murder. I must disagree. The court in *Wayne* did not intrude on the legislative power to define substantive criminal law; rather, it applied the principle that statutes are read in pari materia, thus giving effect to all of the respective elements of conspiracy and first degree murder. The decision in *Wayne* was not motivated by the severity of the punishment for first degree murder, but rather by the recognition that the legislature, in defining first degree murder, delineated that crime from all other degrees of homicide by the element of a specific premeditated intent to kill. Nor do I find that a jury instruction, which explains that each person charged with first degree murder, whether an accomplice or co-conspirator, must possess the specific intent to kill, places an onerous burden on the prosecution.

degree murder even if only his co-conspirator, and not Appellant himself, possessed the specific intent to kill.

The majority rejects this argument by stating that
[w]hen a series of nouns is separated by a comma and the last two elements of a series are the same entity (accomplice or co-conspirator), the sentence is properly understood to consist of a series of two nouns, not three. Thus, the sentence may be read to say, "the jury may find the accomplice guilty if it finds that the defendant *and* his accomplice (or your may think of him as a co-conspirator) acted with specific intent to kill and malice."

Majority op. at 142, 753 A.2d at 1271.

Had the instruction been given as the majority rephrases it, I would wholeheartedly agree that it met the *Huffman* and *Bachert* rule. Yet, this is not the instruction that was given. Rather, it is a concoction derived from the majority's hopes that the jury was privy to the same book of grammar that it had at its disposal.

The plain words spoken by the trial court judge informed the jury that they could find the defendant guilty if the Commonwealth showed that the defendant, his accomplice *or* co-conspirator shot the victim with the specific intent to kill. In my opinion, this instruction informed the jury that it could find Appellant guilty of first degree murder even if only his accomplice or co-conspirator, rather than Appellant himself, had the specific intent to kill. Unlike the majority, I am unable to transmogrify this simple statement, which I believe clearly violates the *Huffman* and *Bachert* rule, into a wholly different instruction. As I believe that it would be unconscionable to allow Appellant's conviction to stand where the jury was erroneously instructed that the Commonwealth need not prove that *Appellant* actually harbored the specific intent to kill, I must respectfully dissent.

Justice ZAPPALA joins this dissenting opinion.